## WOLFE v. BAUMER FOOD PRODUCTS CO. et al.*

### No. 16484.

Court of Appeal of Louisiana. Orleans.

Nov. 30, 1936.

*Rehearing denied Jan. 11, 1937. Writ of certiorari refused March 1, 1937.

156

Gill & Simon, of New Orleans (Warren M. Simon, of New Orleans, of counsel), for appellant.

. Rosen, Kammer, Wolff & Farrar, of New Orleans, for appellees.

JANVIER, Judge.

Eli Baer died in the Charity Hospital at New Orleans on November 18, 1935, as the result of injuries which he had received on November 5, 1935, on or near United States highway No. 90, about a half mile west of Westwego in this state. Mrs. Fanny Wolfe, who alleges that she is his sister and only surviving relative, seeks recovery in tort for his death, claiming $20,220 for her own loss in being deprived of his love and affection and potential support, for funeral expenses, and for the claim which she alleges has survived to her under article 2315, R.C.C., resulting from her brother's suffering during the thirteen days in which he lived after he received the injuries.

She charges that her brother's injuries and subsequent death were the result of his having been struck by an automobile truck of defendant Baumer Food Products Company, which truck, at the time, was operated by one of its employees, Claude Boehm, who, acting within the scope of his employment and operating the truck "at a reckless and wanton rate of speed of approximately fifty-five miles per hour, * * * lost control of it," and permitted it to run "off of the highway into the right-hand ditch and over the bridge on which petitioner's brother was seated. * * *"

Under the provisions of Act No. 55 of 1930, plaintiff makes American Mutual Liability Insurance Company party defendant together with the Baumer Food Products Company and Boehm, the operator of the truck, the allegation with reference to the insurance company being that it had issued to the Baumer Company a policy of liability insurance under which it had agreed to indemnify and hold harmless the said company against loss resulting from the negligent operation of the truck.

The three defendants, in most instances, denied the important allegations of the petition for want of sufficient information, but on the trial they conceded that plaintiff's brother had received injuries on the day in question and had subsequently died in the Charity Hospital, maintaining, however, that the truck had had nothing whatever to do with the said injuries. They also admitted that the truck left the paved portion of the highway and traveled on the shoulder of the road for a short distance and that its two right wheels even went over the edge of the shoulder of the road and into the bordering ditch and then passed lengthwise over the roadside edge of the small bridge on which plaintiff alleges her brother was seated, but they maintain that the said brother was not seated on the bridge and that he was not struck by the said truck, though they concede that almost immediately after the truck had passed over the edge of the bridge and had been brought to a stop some distance beyond and on the other side of the highway plaintiff's brother was found, in an injured condition, lying in the field to which the said bridge gave access and a few feet from the edge of the bridge.

The only question presented is one of fact: Whether the truck in question struck plaintiff's brother, or whether he had already been injured in some other manner and the truck of defendant, by a mere coincidence, left the highway just at that point.

In the district court there was judgment for defendant dismissing plaintiff's suit, and she has appealed.

For the plaintiff there is one witness, C. E. Stovall, who claims to have seen the truck strike Baer, and there are five others who do not claim to have seen the impact but who arrived on the scene soon afterwards and whose testimony, if unexplained, is extremely harmful to defendants' contention. Against these witnesses defendants have only one, Boehm, the driver of the truck.

Boehm states that he was proceeding on the right-hand side of the paved surface of the road "at a moderate rate of speed," when he noticed coming towards him, on its left-hand side of the road, a brown sedan, which was approaching at a speed of about 65 miles per hour, and that he believed that, if he crossed to his wrong side, the driver of the sedan might, at the last instant, go back to his proper side and that a collision would occur and that he instantaneously concluded to drive his truck as far as possible to the right

and upon the shoulder of the road, as he believed that, by doing so, he would afford to the oncoming sedan sufficient space to pass, even if it did not return to its correct side of the road. He also states that, when he drove upon the shoulder of the road, he turned his truck a little too far, with the result that the right wheels went into the edge of the ditch alongside; that he feared that, if he stopped in that position, he might later encounter difficulty in driving the truck out of the said ditch, and that therefore, taking advantage of its momentum, he attempted to turn it and regain the proper position on the road; that before he could do so he crossed over the edge of the small bridge which spanned the ditch and that then his right wheels, after running along the edge of the bridge, again entered the ditch and proceeded some distance further before he could turn to the left and force the car to regain its position on the road; that, as he did so, he found his steering apparatus damaged; and that, as a result, the truck crossed the road and stopped only after it had struck a "guy" wire attached to a post located alongside the road. Boehm states positively that Baer was not on the bridge as the truck passed over it; that he was not struck by the truck, and that it was several minutes later that Baer was found lying about 10 feet or so from the bridge in the nearby field and that the blood which was in Baer's mouth, some of which had spilled to the ground, had coagulated to such an extent as to indicate that it must have been there for a longer time than would have been possible had it been shed as a result of injuries caused by the truck as it passed only a few seconds before. He also states that ants had already gathered at the spot of blood which had formed on the ground under Baer's head.

If the blood had already coagulated and if ants had already gathered, it is most probable that it had resulted from some earlier accident, because these things would probably not have occurred in the short period of a minute or two which elapsed between the time of the passing of the truck and that of the discovery of Baer lying on the ground.

Plaintiff denies that the blood had coagulated or that ants had gathered, and her counsel point to evidence which tends to contradict Boehm on these features. Mr. Vic Pitre, clerk of court of Jefferson parish and mayor of the town of West-

wego, arrived at the scene probably twenty or thirty minutes after the injured man was discovered and he states that at that time Baer seemed to be bleeding "from the nose, and the head, and from his mouth." Dr. J. J. Massony was called to the scene and arrived there only a few minutes after he was sent for. He says Baer "was bleeding right profusely when I got there," and also that he was bleeding "from his mouth and ears and nose and he had a slight bleeding from the left leg." He also states that the blood had not coagulated at the time he arrived.

Leroy Merriday had been working near a house a short distance away and had seen Baer pass along the road a few minutes before the truck passed. When the truck passed, he heard it as it struck the bridge, and, not knowing, of course, that Baer was hurt, or was lying in the field, but feeling that the truck driver himself may have been injured, he, with another witness, Nick Carrault, hurried to the scene, which was only about 300 feet or so away. He says that he did not at that time notice whether Baer was bleeding, but that he ran to get a bucket of water in order to use it to revive him, if possible. It is shown that the water was later dashed into Baer's face and upon his head. Merriday says that when he returned Baer was not bleeding much, but that it looked like "a lump of blood" was "in his mouth" and that when the water was poured on him "the water drew the blood out of his mouth."

Nick Carrault, who arrived with Merriday, says, "I never noticed no blood with no ants around it." He states that some of the blood in Baer's mouth was fresh, but he also testifies that "it looked clotted," and that some of it was red and fresh and "the other was dark."

If we felt that these witnesses had carefully examined the blood in an effort to determine whether it had coagulated and that, after doing so, they, particularly Dr. Massony, had concluded that it had not coagulated, we could not do otherwise than hold that Mr. Boehm was mistaken in his belief that coagulation had taken place. But we feel that when these witnesses first arrived on the scene there was presented to them no question concerning the length of time which had expired since the injuries had been sustained. They assumed, as under the surrounding circumstances they were justified in assuming, that the truck which they saw had

caused the injuries and that the said injuries had been sustained only a few moments before.

Merriday, when the others, except Carrault, arrived, had already thrown the bucket of water over Baer's head, and this would have had the effect, as the evidence shows, of diluting the coagulated blood in his mouth and on the ground and probably of causing fresh blood to flow, and even a trained physician, under such circumstances, not knowing that the time which had elapsed might be of importance and seeing the water discolored by blood and noticing it all over the head of the injured person, might have been justified in concluding that the bleeding had just taken place and that the blood had come from the eyes and the nose and the ears.

There are, as is customary, certain contradictions as to detail, and counsel point to these as indicating that the contradicted witnesses are not telling the truth. For instance, Boehm, the only witness for defendant, states that he did not see Carrault after the accident, although it is quite evident that he was there and that he even spoke to Boehm. There was, no doubt, much excitement and confusion when it was discovered that a man had been seriously injured, and the record shows that many persons congregated. The fact that Boehm did not remember that one of those persons was there does not indicate deliberate untruthfulness on his part. The two witnesses, Merriday and Carrault, who state that they saw Baer walking along the road only a few moments before the truck passed, fixed the time at which they saw him as five minutes before the truck ran over the bridge, but when questioned as to this, they showed plainly that a time considerably longer might have elapsed, and admitted that it might have been as much as fifteen minutes.

We have not, up to this point, discussed the testimony given by Stovall, to whom we have referred, but have devoted ourselves to an effort to determine whether, overlooking for the moment Stovall's statements, the record shows manifest error on the part of our brother of the district court and whether the conclusion which he reached could have been arrived at except as a result of his disbelief of the testimony given by those of plaintiff's witnesses whose evidence we have already discussed. We have done this because we feel that these witnesses obviously told the truth as they saw it, and that, if their testimony could not be reconciled with the testimony given by Boehm, their testimony should prevail and that the judgment would have to be reversed. But we have concluded that their testimony and that of Boehm is not irreconcilable, and that what they testified to may have been the result of their having seen the injured party without realizing that there would be any controversy over the question of whether he was struck by that truck or whether he had been injured in some earlier unknown accident or manner. We conclude that those witnesses could, in good faith, have erred in their conclusions that the truck in question had struck Baer. In fact, it is shown by expert evidence that the injuries which Baer sustained might have been caused, though we think it highly improbable that they were so caused, by a violent fall to the ground. It also appears that sufficient time had elapsed between the time Baer was seen by Merriday and Carrault for him to have been struck by some other vehicle and for his body to have been placed or knocked into the position in which it was later found.

But Stovall's testimony could not have been believed by the district judge, or the judgment must have gone for plaintiff, as both he and Boehm cannot be telling the truth. He stated positively that he saw the truck strike Baer as he was seated on the bridge, but he did and said many things which obviously contradict each other and belie the actual facts to such an extent as to indicate an obvious desire to make the facts appear as favorable to plaintiff as possible. In one part of his testimony, when he was questioned concerning the brown sedan which Boehm said had passed and which, in going upon the shoulder of the road, he was seeking to avoid, he denied that any such car had passed. Yet, only a short time later, he admitted that a car had passed, which car may well have been the sedan to which Boehm had referred. He also said that when he passed the scene of the accident, which was only a second or two after he had seen Baer struck, "I didn't know whose truck it was. I learned later whose truck it was." But only an instant later he stated that he noticed that the truck had on it the name "Baumer Food Products Company."

The record shows conclusively that there were weeds in the ditch which would have,

to a large extent, interfered with the view of Stovall as he approached the scene behind the Baumer Company truck, and it is obvious that the truck itself, together with these weeds, would have made it practically impossible for Stovall to have seen Baer had he been on the bridge, but Stovall says, "At that particular point the view was clear except for some small stems that were there. There are some tall weeds back by the fence line." Only two pages later in the record, after he had been shown a picture of the scene, he admitted that "there are weeds in the ditch." He had also made the statement —obviously incorrect—that he could see over the top of the truck. He said, "You can see over the top of any truck when you are traveling behind it."

Most significant of all we consider his statement that he failed to stop when he saw Baer struck by the truck. If his testimony is true, he was approaching the scene immediately back of the truck and was going at a speed considerably in excess of that at which the truck was being driven. Therefore, when the truck struck Baer, he was only a few feet away and he arrived at the point of the accident in a second or two, and he admits that he slowed down to about 10 miles an hour, but that he decided the best thing to do was not to stop because he was "chicken-hearted." He says he did not stop because he knew that at the filling station, which was some 300 feet or so away, there were several persons who would go back to the scene and render assistance to Baer. We cannot believe that, if he had actually seen Baer struck by the truck and if he had arrived a second or two later, before any one else reached the scene, he would have failed to stop to do what he could to help the injured party or to find out who were the persons involved. Stovall also said that when he saw Baer he was sitting on a box on the bridge and several times he testified that the box was broken and smashed by the truck. But the evidence shows conclusively that there was no box which would have supported the weight of Baer, the only one found afterward being a cardboard box and that box was absolutely intact and undamaged.

The evidence is very conflicting, as we have said. Had our brother of the district court found for the plaintiff obviously we could not have held his finding to be manifestly incorrect. But plaintiff contends that, if the evidence is conflicting, there should be judgment for plaintiff because of the application of the doctrine of res ipsa loquitur, the argument being that the correct position of an automobile is on the highway, and that when it is found to have left this position, to have entered a ditch, to have crossed a bridge, to have then crossed the road, and to have stopped in an unusual position such as that in which this truck stopped, the burden is on the defendant to explain these unusual maneuvers. Hamburger v. Katz, 10 La.App. 215, 120 So. 391. Of course, the doctrine may be said to be applicable and the driver may be under the necessity of explaining such unusual occurrences in a case in which the injury is shown to have resulted from the unusual maneuvers. In other words, if the truck struck Baer and defendants had attempted to avoid liability under the theory that the maneuvers had been made necessary by the sudden emergency caused by the driver of the other car, then the doctrine of res ipsa loquitur would have been applicable and the burden of proving the necessity for the unusual maneuvers would have been upon the defendant. But here defendant contends that the truck did not strike Baer at all and, before there can be any shifting of the burden to defendant, plaintiff must sustain the burden of proving that the truck did strike Baer and did cause the injuries. Plaintiff has failed in this. The district judge having found that the evidence does not justify a conclusion that the truck struck Baer, we cannot say that his finding was manifestly erroneous.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be, and it is affirmed at the cost of appellant.

Affirmed.